**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 2:26-CR-32 |
| Plaintiff, | : | |
| v. | : | |
| TUCKER LEE MARTIN, | : | |
| Defendant. | : | |

**DEFENDANT TUCKER MARTIN'S POSITION WITH RESPECT TO SENTENCING**

For the reasons set forth herein, Mr. Tucker Martin respectfully requests this Court sentence him to 180 months. Mr. Martin is subject to a mandatory minimum sentence of 180 months (15 years) and a statutory maximum of 360 months (30 years). The PSR sets Mr. Martin's Guideline offense level at 42 with a criminal history category of I. The resulting range is 360 months (capped by the statutory maximum). There are no objections to the PSR. While a sentence of 180 months is a downward variance from the Guidelines range of 360 months a weighing of the 3553(a) factors indicates that a fifteen-year sentence is sufficient, but not greater than necessary.

## I. Adolescent Sexual Exposure and ADHD - History and Characteristics of Mr. Martin

There are no excuses for Mr. Martin's behavior but there are reasons. There are at least some known reasons as to why he is where he is and those reasons are relevant to determining the appropriate sentence.

One unhealthy influence that can "negatively affect normal development of sexual functioning and behavior" is Attention Deficit and Hyperactivity Disorder ("ADHD"). Michal Privara and Petr Bob, *Sexual Development in ADHD and Internet Pornography Consumption*, Front, Psychiatry 14:1240222. (Attached as Exhibit A). The executive thinking dysfunctions that come with ADHD can cause problems related to "impulsivity and hypersexuality, aggressive behavior and other problems which may negatively affect psychological development of sexual identity and sexual functioning." *Id.* at 01. Some studies have also reported that those with ADHD have "lower relational satisfaction, impaired quality of romantic relationships…and more maladaptive coping strategies." *Id.* at 02. Other studies found that "sexual activities may serve as mood-altering 'self-medication' process in some individuals with ADHD." *Id.* at 02.

Mr. Martin has struggled with ADHD since his early childhood. He reports difficulty in interacting and building friendships with other children. His inability to control his impulses caused other children to dislike him.

Mr. Martin was himself a victim of a sexual offense when he was eight to ten years old. A 16-17 year old boy who lived in the same neighborhood convinced Tucker to perform oral sex on the older boy. The abuse stopped when the older boy moved.

Tucker was frequently left at home alone with a parent who had to work long hours and lacked the resources and insight into how to deal with ADHD. Tucker's mother experienced significant mental health struggles. Due to her struggles, Tucker had contact with her every other weekend. Tucker's father was a hard working heavy machinery operator. For most of the year, Tucker's father worked long hours. Tucker's childhood perception was that his father was always angry – because of Tucker. Tucker believes that anger was his fault. He internalized that his behavioral problems caused the fraught relationship between the two.

In 2006, 12-year-old Tucker found himself suffering from a lack of personal connections with significant periods of unsupervised access to the internet on his hands. He began exchanging sexual messages and content with people he encountered on the internet. His adolescent mind learned to positively associate the attention he was getting with the sexual nature of the interactions. The interactions became daily. The only way for him to feel liked was to engage with people sexually.

Tucker's ADHD driven impulsivity took root in his psyche as he progressed through adolescence. Any tendency he may have had towards hypersexuality was certainly exacerbated. He was experiencing low relational satisfaction in his life and unsurprisingly developed maladaptive coping strategies – seeking dopamine through internet based sexual contact and content.

Tucker's maladaptive sexually related doping strategies continued to his later teen years. As he turned 16-17 years old, he made two friends. The trio experimented with drugs and frequently attended raves. Tucker reports engaging in sex with adult women who were aware of his age but did not care. His age was "about as taboo as speeding" to the adults he encountered. Separately, he was kicked out of high school for not doing his homework. The belief that he only had value through sexual interactions persisted.

Tucker rose above his drug use. At 18 years old, he joined the military. He stopped reaching for drugs and eventually stopped reaching for alcohol. Unfortunately, he did not rise above his preoccupation with sex and sexual internet communication. His problematic internet pornography use and sexual messaging continued.

## II. What kind of risk does Mr. Martin pose? – protecting the public

What risk does Mr. Martin pose to the public? How concerned should we be that he will commit a hands on offense after he is released? Or, if he never becomes a hands on offender, how concerned should we be that he consumes CSAM material or engages in sexual internet based messaging with minors after he is released? Experts do offer insights into these questions.

There is connection between hypersexuality in those diagnosed with ADHD and problematic internet pornography use. *Exhibit A* at 02. "A highly prevalent form of compulsive sexual behavior in ADHD individuals is 'problematic internet pornography use' (PPU)." *Id.* Some studies "show that ADHD represents a risk factor for problematic pornography use (PPU) as a manifestation of hypersexual phantasies." *Id.* According to the International Classification of Diseases, PPU is characterized by "persistent, excessive, or compulsive use of pornographic content and intensive participating in it, despite distress and adverse consequences." *Id.*

PPU can be a slippery slope into CSAM viewing. Michael Sheath, a long time counselor for people with deviant sexual interests, describes a divide between types of offenders. Mr. Sheath spent over 33 years working with men who abuse children. He started with men who molested children but now also works with "downloaders of child abuse imagery and online groomers." Harriet Grant, *How Extreme Porn has Become a Gateway Drug into Child Abuse*, the Guardian, Dec. 15, 2020. (Attached as Exhibit B). Mr. Sheath divides men into two groups. "The first is older men whose sexual education and awakening came before the internet. They will have in the main learned about sex with another person who gives feedback, resistance, encouragement." *Id.* For this group, "…there was a ceiling on how much porn you could consume…It was limited in scope and there was a stigma on its consumption." *Id.*

> "For the younger men who had their adolescence after about 2000, men up to 40, they will have watched a huge amount of online pornography before they have sex with a human being. And in my personal view that makes an absolutely enormous difference."

*Id.*

> It is the increasingly extreme themes available on mainstream porn sites that he thinks legitimise further deviant and criminal behaviour.
>
> "Anything you want to find you can Google. Typically these men I work with will have been watching porn that is freely available on the internet at eight, nine, 10 years old. This isn't looking at naked ladies, it's group sex, it's rape-themed, incest-themed. And that's at an age when I still believed in Father Christmas."
>
> "If you look at the videos on mainstream porn sites you can see 'teen' themes, 'mom and son' themes, lots of incestuous porn. It's pretty deviant stuff. To watch this you have already lowered your threshold of what is acceptable. Porn is an entry drug for a lot of them."

*Id.* Mr. Sheath explains that some of the men he works with go down what he calls a "potentially escalating pathway." *Id.* By getting used to and internally normalizing increasingly abusive themed pornography, some men take the step of watching real abuse of children. *Id.*

With respect to Mr. Sheath's treatment of the second group of individuals, he notes that a lot of his clients who have engaged with CSAM denied having an actual sexual interest in children. *Id.* In terms of treatment, he describes,

> "One of the exercises we do is I ask the men to tell me about an image they look at, I ask the girl's age, I say what do you reckon her name is, what does she like doing at school? They look absolutely horrified. They have never considered it. They are objectifying this child seeing them just as a mouth, or a body part. When I make them think this is a kid who goes to school and has a hamster, has a mum and dad, they don't like that, it's painful for them.
>
> "We can see a huge improvement in insight. They can reach a point where they have more empathy for the child. We have evidence that our work not only reduces reoffending but brings about changes in empathy levels.

*Id.*

Mr. Sheath's observations were echoed in an article in the Journal for Interpersonal Violence. The article recognized that the increase in CSAM "does not necessarily indicate a corresponding rise in underlying sexual deviance." Melissa S. de Roos, Laura Willkomm, *Cross the Line: Factors Associated with Escalating Pornography Use*, Journal of Interpersonal Violence Vol. 41 (2026) at 6252. (Attached as Exhibit C). "Rather, it appears to be driven by situational factors linked to the increasing accessibility and normalization of online pornography, which may inadvertently facilitate exposure to extreme, and in some cases illegal, material." *Id.* at 6253. The article posits a different pathway than a pre-existing sexual preference for child material that leads a person to consume CSAM. *Id.* The second pathway "is driven by a progressive need for increasingly extreme pornographic content to achieve the same level of arousal." *Id.* "The underlying mechanism is desensitization: prolonged exposure to mainstream pornography reduces arousal responsiveness, prompting individuals to seek greater novelty and intensity of content to reach the same level of arousal…" *Id.* Along this pathway, the primary motivation becomes the thrill-seeking behavior and the pursuit of content extremity. *Id.* This study also notes that problematic pornography use "is intrinsically linked to the consumption of increasingly extreme material…" *Id.* at 6255.

Once someone has engaged with CSAM, the question becomes whether they will then escalate to a hands on offense. "What is the likelihood that an individual convicted of child pornography offenses has a prior history of a hands-on sexual offense involving a child or has a high probability of committing such an offense?" This question is the subject of a 2012 article in the American Psychological Association's Psychology, Public Policy, and Law journal titled *Predicting Hands-on Child Sexual Offenses Among Possessors of Internet Child Pornography*. (Attached as Exhibit D). The article noted, "What portion of men who seek out child pornography

are contact child sex offenders or are at high risk to be contact offenders is estimated by many studies to be relatively small." *Id.* at 646. Still, identifying who among CP offenders are most likely to have a history of child sexual assault or be at high risk for committing such an assault "has obvious legal, as well as clinical import." *Id.* The study had a hypothesis about how to answer that question and sought to test it. The authors hypothesized that offenders "who had committed a hands-on child sexual abuse would be higher in antisociality than Internet-only offenders, while Internet offenders with no known contact offenses would be higher in Internet use history, a possible proxy for sexual preoccupation." *Id.*

The article does not define antisociality or sexual preoccupation but rather assumes an understanding of those terms. The APA dictionary of psychology defines antisocial personality disorder as,

> the presence of a chronic and pervasive disposition to disregard and violate the rights of others. Manifestations include repeated violations of the law, exploitation of others, deceitfulness, impulsivity, aggressiveness, reckless disregard for the safety of self and others, and irresponsibility, accompanied by lack of guilt, remorse, and empathy.

American Psychological Association (September 3, 2026), https://dictionary.apa.org/antisocial-personality-disorder. The Mayo Clinic offers some helpful context.

> Antisocial personality disorder, sometimes called sociopathy, is a mental health condition in which a person consistently shows no regard for right and wrong and ignores the rights and feelings of others. People with antisocial personality disorder tend to purposely make others angry or upset and manipulate or treat others harshly or with cruel indifference. They lack remorse or do not regret their behavior.

Mayo Clinic (September 3, 2026), https://www.mayoclinic.org/diseases-conditions/antisocial-personality-disorder/symptoms-causes/syc-20353928. Antisociality should not be confused with

asociality in this context. Asociality relates to a preference for a lack of social interaction or a lack of sensitivity or regard for social values or norms. American Psychology Association, (September 3, 2026), https://dictionary-apa-org.libdata2015.hilbert.edu/asocial.

Sexual preoccupation is an intense focus on sexual fantasies, urges or behaviors. Mayo Clinic, (September 3, 2026), https://www.mayoclinic.org/diseases-conditions/compulsive-sexual-behavior/symptoms-causes/syc-20360434. The preoccupation can cause distress and problems for a person's health, job, relationships or other parts of life. *Id.*

The study was based on data from 466 male offenders. *Id.* at 647. Of those, 349 had committed a "child sexual offense, either Internet-based or hands-on, or both." *Id.* The study refers to those who have committed an internet sexual offense only and no other known or self-reported hands-on offense as IO offenders. *Id.* Those who committed hands-on offenses only with no internet sexual offenses are referred to as CM offenders. Those who committed both types of offenses are referred to as IO + CM. *Id.* at 647-648. The goal for the study was to see if the methodology used could successfully predict who among the Internet offenders was also a child molester. *Id.* at 650.

Based on the first study discussed in the article, the authors concluded, "If we pose the simple question of the likelihood that someone charged with an Internet-related sex offense is also a hands-on child molester, the key factor of the presence of a history of nonsexual antisocial behavior, from childhood into adulthood, and the relative *un*importance of a history of preoccupation with the Internet is compelling." *Id.* at 654. The authors concluded that internet offenders were low on antisocial behavior and high on internet preoccupation. *Id.* at 663. Those with both hands on offenses and internet offense were high on both factors. *Id.*

As applied to Mr. Martin, there is a factual basis to conclude that he would score high with internet preoccupation. In his initial interview, Mr. Martin discussed his online pornography activity. He stated he doesn't understand how he can like something but also be repulsed by it. (MARTIN Interview (1) around 10:58 AM). During his second interview, Mr. Martin told law enforcement that he looks at pornography too much and that it affects his personal life. (MARTIN Interview (2)). It also makes him late for work. (*Id.*).

There is a reason to believe he would score low on antisocial behavior. The article, at the very last page, contains the questions applied to people analyzed for the study. (*Id.* at 672). Mr. Martin has no criminal history of convictions. He does not have a history of fighting or bullying. There is no history of vandalism or setting fires. Mr. Martin does not have a history of nonsexual antisocial behavior. Consequently, according to the study, Mr. Martin does not represent a high risk of committing a hands on offense.

Another study echoed these findings in drawing distinctions between "contact-driven" offenders and "fantasy-driven" offenders. Kelly M. Babchishin, Hannah L. Merdian, Ross M. Bartels, and Derek Perkins, *Child Sexual Exploitation Materials Offenders*, European Psychology, Recent advances in Criminal Psychology (2018) at 133. (Attached as Exhibit E).

> The study noted that "the profiles of contact-driven offenders suggested some stability in criminal behaviors (e.g., past criminal records, unreported intimate partner violence), and, potentially, a lack of insight into the harmfulness of their actions (e.g., indicators of antisocial lifestyle).

*Id.*

> In comparison, fantasy-driven offenders were characterized by lower levels of criminal activity and other indicators of antisocial tendencies; however, they reported a higher level of sexual deviancy

> (e.g., usage of CSEM1 for sexual arousal; consumption of deviant pornography other than CSSEM) and more intense online engagement with CSEM (e.g., long hours pent online viewing/collecting; high-level social contact to other CSEM offenders) than contact-driven users.

*Id.* The study concluded "CSEM-exclusive offenders generally pose a low risk for contact sexual recidivism (0-2%)." *Id.* at 139. ]

Mr. Martin is not likely to transition to a hands-on offender. Mr. Martin is also unlikely to reoffend with CSAM or inappropriate messaging with minors upon his release after serving a fifteen-year sentence.

## III. Desire for Treatment - History and Characteristics of Mr. Martin

Mr. Martin is in the subset of offenders who can remedy themselves with a combination of incarceration and therapy.

Mr. Martin readily accepts that he needs help. He explains that, in his mind, the process of escalating from regular pornography, through the various taboo subjects, all the way to child pornography normalized the content. The idea that it was "just porn" allowed him to dissociate from the human impact of the material. He describes it like listening to the side effects in a drug commercial; "you just tune it out." Once people are in that state of mind, there is no readily available help. "There is no AA for it." He was either unable to afford care or afraid of what would happen if he reported his activities while in the military or to a therapist outside the context of a criminal case.

[1] Child Sexual Exploitation Materials.

Mr. Martin has been frank in his admission that he would not have stopped his conduct but for the intervention of this case. Mr. Martin explains that he needed forced outside intervention to help him come to terms with the reality of the "scope, severity, and magnitude" of what he was doing. He also acknowledges that he deserves to be and needs to be imprisoned while he continues to receive therapy.

For the first time, Mr. Martin is receiving appropriate treatment. He is being medicated for his ADHD and is undergoing therapy for his sex addiction and related behaviors. He understands that therapy will be a long road but he is hopeful given the success he has experienced thus far. His therapist reports, "…Mr. Martin has made tremendous changes and demonstrated significant progress. Letter from Clinician Sarah James. (Attached as Exhibit F). "He has demonstrated increased insight into his thinking patterns, behaviors, and the factors that contributed to his inappropriate behaviors." *Id.* His therapist noted that he demonstrates genuine remorse regarding the impact his actions had on the victims. *Id.*

Mr. Martin's understanding of his conduct and growth to date is observable in his letter to this Court (Attached as Exhibit G). "Prison is a gift wrapped in thorns. One I look forward to with optimism because with it I can finally get the help I need." *Id.*

**IV. Acceptance of Responsibility - History and Characteristics of Mr. Martin**

Mr. Martin's understanding of the seriousness of his offenses and acceptance of responsibility is demonstrated through the unusual procedure of his case. Mr. Martin has been honest and sought to accept responsibility from the beginning, five years ago.

NCIS received a NCMEC report via the Bedford County Sheriff's Office on May 21, 2021. (USAO-000004, 000006). Suspected child pornography had been uploaded to a Tumblr account associated with Tucker Martin. (*Id.*).

On September 22, 2021, NCIS interviewed Mr. Martin. (USAO-000252). Mr. Martin was forthcoming about his behaviors. He admitted to inappropriately texting minors, asking for photos, and sending photos. (*Id.*). Mr. Martin admitted to downloading child pornography but he would get rid of it because it made him "feel like f******* shit." (USAO-000254). He disclosed the secret folder on his phone where law enforcement could find the pornography and provided access to the folder. (*Id.*). He admitted to having an interest in bestiality. (USAO-000254). He admitted to engaging in inappropriate conversations with other users about sex with young children. (USAO-000255). "He said he did not understand how he could like something and hate something at the same time, referring to child pornography." (*Id.*).

He denied ever molesting a child and agreed to take lie detector test. (USAO-000256). During the polygraph test, Mr. Martin was asked whether "As an adult, have you participated in any undisclosed sexual activity with a minor?" and "Since the age of 18, have you ever had any undisclosed sexual contact with a minor?" (USAO-000043). Mr. Martin answered "no" to both questions. (*Id.*). The report indicates that Mr. Martin "displayed no significant response to the relevant questions." (*Id.*).

During the September 2021 interview, Mr. Martin admitted to the conduct that is the basis for Counts 2 and Count 2A (as listed in the PSR). Mr. Martin was not detained while the investigation continued. He was told by NCIS not to leave the state. Mr. Martin has complied with that request despite plenty of opportunity to do otherwise. He has not seen is father, who lives in Texas, since 2019.

Almost one year later, law enforcement received information that Mr. Martin sent inappropriate messages about sleeping with children. (USAO-000420). Mr. Martin was interviewed again on September 26, 2023. (USAO-000810). Again, Mr. Martin was forthcoming

about the additional behavior he had engaged in since the first interview. He provided consent for law enforcement to examine his cell phone and his laptop computer and provided the passwords. (USAO-000814).

Mr. Martin was discharged from the Navy on or around February 15, 2024. (USAO-000839). A few months later, on July 2, 2024, he received a letter from the United States Attorney's Office. The letter indicated that the Government was considering a multi-count indictment but was willing to reach a pre-indictment resolution of the charges. Mr. Tucker obtained the help of the public defender's office who responded to the letter. The Government represented to undersigned counsel that the Government did not respond to the public defender's office. Their office seemingly lost track of Mr. Martin's case.

To be clear, the fault does not lie with the Government for Mr. Martin's ongoing criminal behavior after his initial interview. That fault lies squarely with Mr. Martin. That said, his openness about his offenses and decision to stay and see the case through is indicative of acceptance of responsibility for his actions.

Mr. Martin was indicted on March 11, 2026. Discovery was provided on March 30, 2026. The deadline for Mr. Martin to accept his plea offer was set for April 15, 2026. It is unusual, at least in undersigned counsel's experience, to be able to get a client through discovery and in a position to accept a plea agreement with a fifteen year mandatory minimum within a two-week time frame. It is a credit to Mr. Martin that he understood the situation he put himself in and the nature of his conduct such that he was willing and able to come to terms with that sort of sentence within such a short time frame.

## V. Mitigating Factors, Aggravating Factors, and Problems with the Guidelines

There are widely recognized problems with how the Guidelines deal with child pornography offenses. Although centered on §2G2.2 (Mr. Martin is subject to §2G2.1), the Sentencing Commissions 2012 *Federal Child Pornography Offenses*[2] report is relevant to Mr. Martin. The report explained that sentencing data indicated "that a growing number of courts believe that the current sentencing scheme in non-production offenses is overly severe for some offenders." *Id.* at ii. The Commission found, "…the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degree of culpability." *Id.* "…[F]our of the six sentencing enhancements in §2G2.2 – those relating to computer usage and the type and volume of images possessed by offenders, which together account for 13 offense levels – now apply to most offenders and, thus, fail to differentiate among offenders in terms of their culpability." *Id.* at iii. The commission specifically noted, "The typical offender's collection not only has grown in volume but also contains a wide variety of graphic sexual images (including images of very young victims), which are now readily available on the Internet." *Id.* at ii-iii.

Mr. Martin is subject to enhancements that apply to most offenders. According to a 2021 follow up report by the Sentencing Commission, "A majority of the non-production child pornography offenders had images or videos of very young victims." U.S. Sent. Comm'n, *Federal Sentencing of Child Pornography Production Offenses* (Oct. 2021), at 31.[3] Of the defendants sentenced in 2019, "over half (52.2%) of the offenders had images or videos of infants or toddlers

[2]https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf

[3]https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20211013_Production-CP.pdf

(22.8% and 29.4%, respectively) and nearly every offender (99.4%) had images or videos depicting victims who were prepubescent or under the age of 13." *Id.* Mr. Martin is subject to enhancements related to age. The involvement of multiple victims is also a common fact. Forty-one percent of 2019 cases involved more than one minor victim "ranging from two to 440 victims." *Id.* at 4.

The enhancement related to the relationship between Mr. Martin and the child in Count2A is also not unusual. The Sentencing Commission reported that, of the 512 child pornography production offenders sentenced in 2019, "60.3 percent were related to or otherwise maintained a position of trust over the minor victim, whether through familiar relationships or by virtue of the offender's role as a teach or a coach, for example." *Id.* at 4.

While these factors are aggravating as compared to defendants who lack them, these factors do not distinguish Mr. Martin from most defendants sentenced. When the underlying facts of Mr. Martin's conviction and pseudo conviction are considered, there are mitigating factors. To be clear, the facts are terrible but, there are degrees of terribleness in these types of cases.

With respect to Count 2A, the child was properly clothed, unaware, and untouched. Mr. Martin was sending messages via Tumblr to an adult woman. Mr. Martin asked the woman if he should expose his penis (and presumably send her a photo). The woman, knowing the toddler was in the room replied, "if they aren't gonna see then yes pls." Mr. Martin sent a picture of his penis with the toddler in the background. The toddler was fully clothed and was watching television. (USAO-000066). Mr. Martin's messages following his sending of the photo indicate that the child was used to take part in sexually explicit conduct for the purposes of producing a visual depiction of that conduct such that the elements of 18 U.S.C. § 2251(a) are met.

The facts related to Count 2 are certainly disturbing. Mr. Martin exchanged sexually related messages with a person who stated they were a 13 year old girl.[4] He solicited photos from the child that would have constituted CSAM. He messaged the child about her engaging in sexual activity with a dog. Mr. Martin's messages with this child are despicable, to be clear. That said, as compared to other cases sentenced under §2G2.2, there are mitigating factors. Mr. Martin did not lie about his own identity, he did not threaten the child, he did not promise any benefit in exchange for her conduct, nor he did not seek to compel her participation.

The Sentencing Commission, in its 2021 report, noted that offenders who asked the victim to create the content were a minority at 36.5%. *Id.* at 34. Forty percent of the pornography production offenders "incapacitated, coerced, or enticed a minor victim, or misrepresented their identity to facilitate the child pornography production offense." *Id.* at 37. One in five coerced a minor to participate in the offense. *Id.* at 38. The most common type of coercion used was "sextortion." *Id.* at 38. "It involves coercing a minor by using, or threatening to use images or videos previously obtained to demand that the minor engage in a sexual act with the offender or to demand additional images or videos that are sexual in nature." *Id.* "Sextortion can take many forms, including making threats to harm family or friends unless the victim complies with demands, hacking to gain access or control of the computer's webcam to obtain images and videos, or leading the victim to believe the perpetrator can be trusted." *Id.* Mr. Martin did not exhibit any of these behaviors.

---

[4] There are no facts upon which to conclude that the person was anything other than a 13 year old girl.

Another one-fifth of child pornography production offenders misrepresented their identity "in some manner to lure victims into participating in the production offense…" *Id.* at 39. Some offenders misrepresented their age and genders. *Id.* Others represented themselves "as talent scouts, photographers, modeling agents, or employers." *Id.* Mr. Martin did not represent his identity. He stated he was 27 years old and used the messaging system "for sexting."

The inability of the Guidelines to capture meaningful distinctions between offenders is observable through examining local cases with the same or similar Guidelines to Mr. Martin.

Rian Johnson also had a Guideline offense level of 42 with a criminal history category of I. *USA v. Rian Wayne Johnson*, 4:25-cr-00059 (E.D. VA 2026), Position on Sentencing by USA, Doc. 27. Mr. Johnson was the primary care giver of an 11 year old child who he sexually exploited by having her perform oral sodomy on him. *Id*. Mr. Johnson recorded videos of a sexual nature of the child on his cell phone. The Government emphasized that the "defendant repeatedly sexually abused Jane Doe and documented the abuse." *Id.* Mr. Johnson was sentenced to 324 months for sexual exploitation of children. Judgment Entry, Doc. 33.

Shane Harlacher's Guideline range was one offense level less that Mr. Martin's. *USA v. Shane Matthew Harlacher*, 2:25-cr-63 (E.D. VA 2026), Position on Sentencing by USA, Doc. 32. Mr. Harlacher's Guideline level was 41 with a criminal history category of I. *Id.* Mr. Harlacher was attributed with having 8,657 CSAM files which he had collected since 2017. *Id.* That content included sexual abuse of a toddler and a girl being choked by an adult male. *Id.* Mr. Harlacher obtained "a spy camera and secretly filmed a 13-year-old child, Jane Doe, in the bathroom at his home in Virginia Beach. *Id.* "He did so on several occasions, and then later edited and clipped the videos to maximize his sexual gratification to focus on Jane Doe's genitalia." *Id.* He was sentenced to 300 months for production of CSAM. Judgment Entry, Doc. 43.

Corey Hambley's Guidelines offense level of 49 (with a criminal history category of I) is immaterial given the sentencing table already assigns life at an offense level of 43. *USA v. Cory Richard Hambley*, 2:25-cr-44 (E.D. VA 2026), Position on Sentencing by USA, Doc. 78.

> The defendant, who held a Top Secret security clearance and worked in missile defense for the U.S. Navy, was married, and owned an expensive, 9-bedroom home, instigated a scheme whereby his ex-girlfriend, co-defendant Grace Paradis, recorded herself repeatedly sexually molesting two girls, then 5 and 9 to 6 and 10 years old, for the defendant's sexual gratification.

*Id.* "The defendant plied Paradis with rent money and the potential of future marriage to induce her to record herself showering with the girls and rubbing their breasts, shaving their pubic areas, and most diabolically, orally sodomizing them while they slept, on multiple occasions." *Id.* "He also proposed Paradis drug the young girls to facilitate their sexual abuse." *Id.* "The defendant and Paradis further drew up a contract specifying rules for grooming and molesting future children they would have together." *Id.* The defendant secretly recorded another minor "to whom he had access" masturbating. *Id.* He sent that same child a video of that child's mother performing oral sex on the defendant "in an apparent grooming effort." *Id.* Notably, the defendant had secretly recorded two adult victims who served in the Navy with him years beforehand. *Id.* Corey Hambley was sentenced to 420 months for conspiring to produce visual depictions of minors engaged in sexually explicit conduct and use of an interstate commerce facility to do so. Grace Paradis, Corey Hamble's ex-girlfriend, was sentenced to 340 months. *USA v. Grace Elizabeth Paradis*, 2:25-cr-44 (E.D. VA 2026).

In summary, overreliance on the Guidelines to fashion an appropriate sentence for Mr. Martin will result in a sentencing disparity and/or a sentence that is greater than necessary. The aggravating factors in Mr. Martin's case like age of the children involved and his relationship to

one of them are prevalent in most cases. The Guidelines' attempt to distinguish offenders based on those factors is, as recognized by the Sentencing Commission itself, ineffective. Then, as we can see through the Johnson, Harlacher, and Hambley cases, the Guidelines do not meaningfully distinguish between large range of offense conduct. It is unreasonable that for all practical purposes Tucker Martin and Corey Hambley are only one offense level apart.

## VI. Sentencing Disparities

Due to the problems in the Guidelines, courts have given downward variances to 61% to defendants whose Guideline range was determined by §2G2.1, who had an offense level of 42, and fell in Criminal History Category I and were sentenced in fiscal years 2021-2025, 61% received a downward variance.




**Note:** The figure includes the 308 defendants reported to the Commission whose primary guideline was §2G2.1, with a Final Offense Level of 42 and a Criminal History Category of I, including defendants who received a §5K1.1 substantial assistance departure. Cases missing information necessary to complete the analysis were excluded from this figure. Defendants who received a §5K1.1 substantial assistance departure are included in this analysis but are excluded from other analyses below. As such, the number of defendants included in this analysis may exceed the number of defendants in other analyses. Total percentages displayed in the figure may not sum to 100% due to rounding.

U.S.S.G. Judiciary Sentencing Information.[5] Due to the problems with the Guidelines highlighted above, the median length sentence of 300 months is not helpful in determining an appropriate

[5] https://jsin.ussc.gov/analytics/saw.dll?Dashboard

sentence for Mr. Martin. The scope of conduct that falls under this Guideline is exceedingly large and the enhancements do not meaningfully distinguish between the types of conduct covered. A system that scores Mr. Martin and Corey Hambley essentially the same is not reliable.

The facts underlying comparable local cases from 2026 provide a reliable benchmark when seeking to avoid unwarranted sentencing disparities.

Christopher Charles Collins was sentenced to 180 months for attempted coercion and enticement of a child and receipt of child pornography. *USA v. Christopher Charles Collins*, 4:26-cr-19 (E.D. VA July 30, 2026), Judgment Entry, Doc. 30. Mr. Collins "engaged online with an undercover officer posing as a 14-year-old female" on social media. Position on Sentencing by USA, Doc. 25. He was arrested when he arrived to meet the purported child. *Id.* The defendant "admitted to chatting online with underage girls…" *Id.* He was "attributed with over a thousand images of child pornography." *Id.* Notably, the defendant committed the offense while on supervised release. *Id.* He had a 2018 conviction the Western District of Virginia for the Attempted Transfer of Obscene Material to Person Under 16 Years of Age and Possession of Child Pornography. *Id.* He was given 78 months for the prior federal conviction. *Id.*

Asia Billups was sentenced to 180 months for two counts of production of child pornography and one count of distribution of child pornography. *USA v. Asia Billups*, 4:24-cr-70, (E.D. VA Sept. 26, 2025), Judgment Entry, Doc. 74. Ms. Billups Guidelines level was 43 with a criminal history category of I. Position on Sentencing by USA, Doc. 70. Ms. Billups produced digital video files of sexually explicit content with minors whom she was babysitting. Statement of Facts, Doc. 52. One of the minors was three years old. *Id.* The other minor was four months old. *Id.* Ms. Billups exchanged in appropriate messages with a co-defendant about the content of the videos. *Id.*

Keonte Martin was sentenced 180 months for receipt of child pornography. *USA v. Keonte Navon Martin*, 4:25-cr-37, (E.D. VA Feb. 13, 2026), Judgment Entry, Doc. 40. The defendant had a prior federal conviction for possession of child pornography for which he was sentenced to 48 months in prison. Position on Sentencing by USA, Doc. 37. While finishing his sentence at a half-way house, the defendant was found to be in possession of a phone with child pornography on it. *Id.* The defendant was attributed with over 600 images of child pornography. *Id.* On his prior conviction, he was attributed with 11,000 picture files and 51 videos of child pornography and exploitation. *Id.*

Kemp Nelson was sentenced to 180 months for sexual exploitation of a child. *USA v. Kemp Jermaine Nelson*, 4:25-cr-68 (E.D. VA June 24, 2026), Judgment Entry, Doc. 51. Mr. Nelson had an offense level of 43 and a criminal history category of III. Position on Sentencing by USA, Doc. 48. The defendant reported that he was dating a 16 year old and, because he understood that the minor was homeless, was helping her out by giving her a place to stay. Statement of Facts, Doc. 41. Mr. Nelson had sex with the minor and posted a video of the two engaged in sexual intercourse on his Twitter account. *Id.* The defendant described himself to law enforcement as a "content creator" and "porn star." *Id.*

Mr. Martin's case is notably different than these cases. However, his conduct is in the same ballpark. It is difficult to rationalize why he is deserving of a higher sentence than Collins who sought physical contact with a minor, than Billups and Nelson who committed hands on offenses, or than Martin who had a prior federal conviction.

## VII. Supervised Release and Collateral Consequences

Mr. Martin's punishment does not end with his release from prison. Mr. Martin will be a convicted felon and will be required to register as a sex offender. His employment opportunities and thus his income potential will be permanently negatively impacted. His sex offender status will place him at the margins of society for the rest of his life.

Mr. Martin will also be subject to supervised release. The conditions of supervised release are designed to protect the public from Mr. Martin upon his release.

## VIII. Restitution

Mr. Martin is not contesting the restitution requested in his case. The representative for the victim in the Ali of ZooFamily series has requested the minimum amount of $3,000. That victim has recovered $1,467,000 from 457 defendants. The representative for the victim of the SparklingVelvet series has requested $5,500. Mr. Martin possessed three images and one video from this series. He did not distribute any of the files.

## IX. Conclusion

While Mr. Martin's offenses are serious and call for significant punishment, he respectfully suggests that 180 months is sufficient but no greater than necessary. Mr. Martin also respectfully requests that he be permitted to self-surrender directly to a BOP facility. He has been aware that he will be given an 180 month sentence at absolute minimum during the entire pendency of this case. He has not fled. He has complied with his pretrial supervision. He has demonstrated that he can be trusted to surrender himself.

Respectfully submitted,

*/s/ Stephanie F. Kessler*
STEPHANIE F. KESSLER (100602)
Kessler Defense LLC

500 East Main St, 1600
Norfolk, VA 23510
(513) 316-5807
stephanie@kesslerdefense.com

*Attorney for Tucker Lee Martin*